# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1727

_____

S. J. W., By and Through His Parents, Brian Wilson and Linda Wilson; S. W. W.,
By and Through His Parents, Brian Wilson and Linda Wilson

*Plaintiffs - Appellees*

v.

Lee's Summit R-7 School District; Dr. David McGehee, Superintendent, In His
Individual and Official Capacity; Jack Wiley, Board President, In His Individual
and Official Capacity; Chris Storms, Board Member, In His Individual and
Official Capacity; Terri Harmon, Board Member, In Her Individual and Official
Capacity; Patti Buie, Board Member, In Her Individual and Official Capacity; Ron
Baker, Board Member, In His Individual and Official Capacity

*Defendants - Appellants*

------------------------------

ACLU Foundation of Kansas and Western Missouri; ACLU Eastern Missouri

*Amici on Behalf of Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 19, 2012
Filed: October 17, 2012

_____

Before MELLOY and BENTON, Circuit Judges, and BAKER,[1] District Judge.
_____

MELLOY, Circuit Judge

The Lee's Summit R-7 School District ("the School District") issued 180-day suspensions to twin brothers Steven and Sean Wilson (together, "the Wilsons") on January 11, 2012 for disruption caused by a website the Wilsons created. The Wilsons filed suit against the School District on March 6, 2012, alleging, along with other claims, that the School District violated their rights to free speech. The Wilsons also filed a Motion for a Preliminary Injunction to lift their suspensions.[2] On March 23, 2012, the District Court entered an Order granting the Wilsons' Motion for a Preliminary Injunction. The School District filed a Notice of Appeal on March 27, 2012. The School District also filed an Expedited Motion for a Stay Pending Appeal on March 29, 2012, which we denied.

The matter currently before this court is the School District's appeal of the Order granting the Wilsons' Motion for a Preliminary Injunction. We hold that the District Court's findings do not support a preliminary injunction. Accordingly, we vacate the District Court's Order and reverse the preliminary injunction.

I.

In December 2011, the Wilsons were juniors at Lee's Summit North High School ("Lee's Summit North") in the School District. During the week of December

_____

[1]The Honorable Kristine Gerhard Baker, United States District Court for the Eastern District of Arkansas, sitting by designation.

[2] Although the Wilsons' Amended Complaint contains other claims, their Motion for a Preliminary Injunction was based solely on their free speech claim.

12, 2011, the Wilsons created a website called NorthPress. NorthPress contained a blog. According to the Wilsons, the purpose of the blog was to discuss, satirize, and "vent" about events at Lee's Summit North. The Wilsons used a Dutch domain site, which prevented U.S. users from finding NorthPress via a Google search, but any U.S. user could access NorthPress if she knew the website address. The site was not password-protected.

Between Tuesday, December 13 and Friday, December 16, 2011, the Wilsons added posts to the NorthPress blog. The Wilsons' posts contained a variety of offensive and racist comments as well as sexually explicit and degrading comments about particular female classmates, whom they identified by name.[3] The racist posts discussed fights at Lee's Summit North and mocked black students. A third student added another racist post.

The parties dispute the extent to which the Wilsons used Lee's Summit North computers to create, maintain, or access NorthPress. On Tuesday, December 13, one of the Wilsons used a school computer to upload files needed to create NorthPress. The School District's computer records also show a person or people accessed NorthPress using Lee's Summit North computers on Wednesday, December 14 and Thursday, December 15,[4] but the records do not show who accessed the site. The School District cannot prove whether those users added content to the site or merely viewed it.

_____

[3] The record suggests the Wilsons were not equally responsible for the posts; one of the Wilsons may have authored only a single post. However, all the posts quoted in the record contained offensive and derogatory language.

[4] On Wednesday, December 14, at least three Lee's Summit North computers and a total of six computers within the School District were used to access NorthPress; on Thursday, December 15, one Lee's Summit North computer and one computer at a middle school within the School District were used to access NorthPress.

The Wilsons testified they initially told only five or six school friends about NorthPress. The Wilsons also claimed they intended only their friends to know about NorthPress. However, whether by accident or intention, word spread quickly. On the morning of Friday, December 16, the Lee's Summit North student body at large learned about NorthPress.

Based on student and faculty reports, Lee's Summit North administrators quickly linked the Wilsons to NorthPress. Lee's Summit North administrators immediately suspended the Wilsons for ten days and referred the matter to the School District. Following a hearing, an appeal by the Wilsons, and a second hearing, the School District suspended both Wilsons from Lee's Summit North for 180 days but allowed them to enroll in another school, Summit Ridge Academy, for the duration of their suspensions. The Wilsons filed suit against the School District and moved for a preliminary injunction to lift the suspensions.

The District Court conducted a preliminary injunction hearing on March 19, 21, and 22, 2012. At the hearing, the Wilsons testified they intended the posts on NorthPress to be satirical rather than serious. The Wilsons denied they were racists. The Wilsons testified that December 16, 2011 was a normal school day free from significant disruptions and suggested that the third student's post was the sole cause of any actual disruption. The Wilsons claimed that the classes at Summit Ridge Academy were not academically challenging, that Summit Ridge Academy did not provide honors courses, and that Summit Ridge Academy did not provide ACT classes. The Wilsons also testified they wanted to pursue careers in music or theater, and their chances for college band scholarships would be hurt if they could not participate in the Lee's Summit North band. The Wilsons' parents testified they did not believe their sons would be in any danger at Lee's Summit North.

Conversely, the School District's witnesses testified the public discovery of NorthPress caused substantial disruption on December 16, 2011. The School

District's computer records from December 16 show numerous Lee's Summit North computers were used to access or to attempt to access NorthPress.[5]  Lee's Summit North teachers testified they experienced difficulty managing their classes because students were distracted and in some cases upset by NorthPress; at least two teachers described December 16 as one of the most or the most disrupted day of their teaching careers.  Lee's Summit North administrators testified that local media arrived on campus and that parents contacted the school with concerns about safety, bullying, and discrimination, both on December 16 and for some time afterwards.  Additionally, Lee's Summit North administrators expressed concern that the Wilsons' early return to Lee's Summit North would cause further disruption and might endanger the Wilsons.

On March 22, 2012, the District Court granted the Wilsons' Motion for a Preliminary Injunction in an oral ruling and subsequently issued a written order to the same effect.  In its oral ruling, the District Court considered "likelihood of success, whether plaintiffs will suffer irreparable harm if relief is denied, whether the balance of inequities tips in the plaintiffs['] favor, [and] whether injunctive relief is in the public interest."  The District Court observed no Eighth Circuit decision directly controlled the Wilsons' free speech claim.  However, the District Court pointed to two pertinent Eighth Circuit cases, Doe v. Pulaski County Special School District, 306 F.3d 616 (8th Cir. 2002), and D.J.M. v. Hannibal Public School District #60, 647 F.3d 754 (8th Cir. 2011).  The District Court observed that the Wilsons needed to show a "fair chance" of success on the merits.  Citing cases from other circuits, the District Court concluded, "there does seem to be a distinct possibility that the

---

[5] The School District blocked access to NorthPress from its computers when administrators learned about the website.

defendants could be exonerated based on the discussion that I've mentioned and the cases that I have reviewed."[6]

The District Court credited the testimony of Lee's Summit North teachers and concluded NorthPress "caused considerable disturbance and disruption on Friday, the 16th." Although the District Court evidently agreed that the third student's post was the primary cause of the disturbance on December 16, the District Court also noted at least one of the Wilsons' posts about a female student "was part of the sensation that day" and concluded "[t]he greatest school wide problem apparently was created by several racist blogs, one of the worst of which was authored by the first twin." The District Court found that the NorthPress blog was "targeted at" Lee's Summit North.

The District Court found that the Wilsons' inability to try out for the Lee's Summit North band or attend the honors classes offered at Lee's Summit North constituted irreparable harm. It concluded the balance of equities clearly favored the Wilsons. The District Court concluded an injunction posed no material harm to the School District. It identified no significant public interests at play "other than in a fair and reasonable disposition of the motion." Based on these conclusions, the District Court entered an Order granting the Wilsons' Motion for a Preliminary Injunction and allowing the Wilsons to return to Lee's Summit North on April 9, 2012.

The School District appealed the preliminary injunction. Following our denial of the School District's Expedited Motion for Stay Pending Appeal, the Wilsons returned to Lee's Summit North. As a result of the preliminary injunction, the Wilsons have not completed their suspensions.

---

[6] The School District suggests the District Court misspoke and meant to say *the Wilsons* "could be exonerated"—that is, that the Wilsons had a "distinct possibility" of success. We have no reason to believe the District Court misspoke; we believe the District Court was referring to the School District and the other defendants.

On appeal, the School District argues the District Court failed to make sufficient findings of irreparable harm and failed to make an appropriate finding of the Wilsons' likelihood of success. The School District argues the preliminary injunction essentially forgave the Wilsons' suspensions—if the Wilsons graduate before the District Court reaches a final decision on the merits, which is likely, the School District will not be able to enforce the remainder of the suspensions even if it prevails on the merits. Thus, the School District argues, the preliminary injunction gave the Wilsons "substantially all the relief sought" and should have been treated as a motion requesting a permanent rather than preliminary injunction.[7] Finally, the School District alleges the District Court improperly shifted the burden from the Wilsons to the School District when the District Court suggested this case could be resolved by summary judgment motions during summer 2012.

The Wilsons argue the District Court's findings adequately support the preliminary injunction. The Wilsons contend their posts on NorthPress were protected free speech for which the School District could not constitutionally punish them. The Wilsons claim NorthPress did not cause significant disruption at Lee's Summit North, but maintain the third student's post was the sole cause of any actual disruption. Finally, the Wilsons argue the Communications Decency Act insulates them from punishment altogether.

II.

"We review the denial of a preliminary injunction for an abuse of discretion, which occurs when 'the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions.'" Phelps-Roper v. Troutman, 662 F.3d 485,

---

[7] The School District makes much of the fact that the preliminary injunction altered rather than maintained the status quo. It argues injunctions which alter the status quo are subject to a higher standard of proof. However, the School District cites no relevant Eighth Circuit authority in support of this argument.

488 (8th Cir. 2011) (quoting Planned Parenthood v. Rounds, 530 F.3d 724, 733 (8th Cir. 2008) (en banc)). "We review the district court's legal conclusions de novo." Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1000 (8th Cir. 2012) (citing Grand River Enters. Six Nations, Ltd. v. Beebe, 467 F.3d 698, 701 (8th Cir. 2006)). "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).

We do not find that the District Court made inadequate factual findings; rather, we "conclude that its findings do not support the relief granted." Id. at 114. We hold that the Wilsons are unlikely to succeed on the merits under the relevant caselaw. We also conclude the District Court's findings do not establish sufficient irreparable harm to the Wilsons to justify a preliminary injunction.

A. Likelihood of Success of the Merits

"In deciding whether to grant a preliminary injunction, 'likelihood of success on the merits is most significant.'" Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995) (quoting S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992)). The Wilsons' success on the merits will depend on what standard the District Court applies. The School District argues Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), should control. The Wilsons argue otherwise. First, the Wilsons argue all off-campus speech is protected and cannot be the subject of school discipline, even if the speech is directed at the school or specified students. Alternatively, they argue that if Tinker applies, the speech was not directed at the school and did not create a substantial disruption.

"It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker, 393 U.S. at 506. However, in the school environment, some speech is not protected by the First Amendment, and school officials may lawfully punish some forms of unprotected student speech. Under Tinker, "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 513. Thus, student speech that causes a substantial disruption is not protected. Based on the cases below and on the District Court's finding that NorthPress was "targeted at" Lee's Summit North, we believe Tinker is likely to apply. Further, because the District Court found the Wilsons' posts caused a substantial disruption, the Wilsons are unlikely to succeed on the merits under Tinker.

In D.J.M. v. Hannibal Public School District #60, we indicated that Tinker applies to off-campus student speech where it is reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting. 647 F.3d 754, 766 (8th Cir. 2011). In instant messages to a school friend, plaintiff D.J.M. threatened to obtain a gun and shoot students at his school. Id. at 756. D.J.M. sent the instant messages from his home. Id. D.J.M.'s friend reported the instant messages to the school principal, and D.J.M. was suspended. Id. Following Tinker, we determined D.J.M.'s speech was not protected by the First Amendment.[8] Id. at 766. Because it was "reasonably foreseeable" D.J.M.'s speech "would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment," and because the speech did actually cause substantial disruption, the school could lawfully punish D.J.M. Id.

_____

[8]We also concluded D.J.M.'s instant messages constituted true threats, which we analyze under a different standard. See D.J.M., 647 F.3d at 761–66.

Cases from other circuits support our conclusion that Tinker should apply and that the Wilsons are unlikely to succeed on the merits under Tinker. First, in Doninger v. Niehoff, the Second Circuit refused to enjoin the punishment of a student who used her home computer to post rude comments about an administrator online. 527 F.3d 41, 46 (2d Cir. 2008). As punishment for her posts, the school barred plaintiff Doninger from participation in student government, and Doninger filed suit on First Amendment grounds. Id. at 46–47. The district court refused to preliminarily enjoin Doninger's punishment and the Second Circuit affirmed. Id. at 43–44. The Second Circuit concluded Doninger's speech was "'purposely designed'" to reach the school's campus because "[t]he blog posting directly pertained to events at LMHS, and [Doninger's] intent in writing it was specifically 'to encourage her fellow students to read and respond." Id. at 50 (quoting Doninger v. Niehoff, 514 F. Supp. 2d 199, 216, 206 (D. Conn. 2007). The Second Circuit held "that a student may be disciplined for expressive conduct, even conduct occurring off school grounds, when this conduct 'would foreseeably create a risk of substantial disruption within the school environment,' at least when it was similarly foreseeable that the off-campus expression might also reach campus." Id. at 48 (quoting Wisniewski v. Bd. of Educ., 494 F.3d 34, 40 (2d. Cir. 2007)).

Second, in Kowalski v. Berkeley County Schools, the Fourth Circuit concluded a school district did not violate plaintiff Kowalski's First Amendment rights when it suspended Kowalski for creating a website on which other students posted defamatory information about a classmate. 652 F.3d 565, 567 (4th Cir. 2011), cert denied, 132 S. Ct. 1095 (2012). Even though Kowalski created the website at home,

> she knew that the electronic response would be, as it in fact was, published beyond her home and could reasonably be expected to reach the school or impact the environment. She also knew that the dialogue would and did take place among Mussleman High School students whom she invited to join [the online group] and that the fallout from her

-10-

conduct and the speech within the group would be felt in the school itself.

Id. at 573. Therefore, "the School District was authorized by Tinker to discipline Kowalski, regardless of where her speech originated, because the speech was materially and substantially disruptive in that it 'interfer[ed] . . . with the schools' [sic] work [and] colli[ded] with the rights of other students to be secure and to be let alone.'" Id. at 573–74 (alterations in original) (quoting Tinker, 393 U.S. at 508).

Finally, in J.S. v. Blue Mountain School District, the Third Circuit found that a school district had violated the First Amendment rights of plaintiff J.S. when it suspended J.S. for creating, outside of school, an online profile for the school principal that mocked the principal and contained "adult language and sexually explicit content." 650 F.3d 915, 920 (3d Cir. 2011), cert denied, 132 S. Ct. 1097 (2012). Unlike Kowalski's speech, "[t]here [was] no dispute that J.S.'s speech did not cause a substantial disruption in the school." Id. at 928. "The profile was so outrageous that no one could have taken it seriously . . . . Thus, it was clearly not reasonably foreseeable that J.S.'s speech would create a substantial disruption or material interference in school . . . ." Id. at 930. Therefore, "the School District's actions violated J.S.'s First Amendment free speech rights." Id. at 920. The Third Circuit "assum[ed], without deciding," that Tinker applied. Id. at 926.

Based on these cases, we expect Tinker will apply here because the Wilsons' speech was, in the District Court's words, "targeted at" Lee's Summit North. The parties dispute the extent to which the Wilsons' speech was "off-campus," but the location from which the Wilsons spoke may be less important than the District Court's finding that the posts were directed at Lee's Summit North. Just like the online speech in Kowalski and Doninger, the NorthPress posts "could reasonably be expected to reach the school or impact the environment." Kowalski, 652 F.3d at 573. Furthermore, unlike in J.S., the District Court found that the NorthPress postings

-11-

"caused considerable disturbance and disruption on Friday, the 16th." Under <u>Tinker</u>, speech which actually caused a substantial disruption to the educational environment is not protected by the First Amendment. Therefore, the Wilsons are unlikely to succeed on the merits.

B. Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" <u>Roudachevski v. All-Am. Care Ctrs., Inc.</u>, 648 F.3d 701,706 (8th Cir. 2011) (quoting <u>Iowa Utils. Bd. v. Fed. Commc'ns Comm'n</u>, 109 F.3d 418, 425 (8th Cir. 1996)). "The <u>Dataphase</u> court noted that a failure to demonstrate irreparable harm, standing alone, may be a sufficient basis to deny preliminary injunctive relief." <u>Caballo Coal Co. v. Ind. Mich. Power Co.</u>, 305 F.3d 796, 800 (8th Cir. 2002) (citing <u>Dataphase</u>, 640 F.3d at 114 n.9). The District Court's findings do not show that the Wilsons would have suffered irreparable harm in the absence of an injunction.

In finding irreparable harm, the District Court relied in part on the Wilsons' argument that the academic work at Summit Ridge Academy was insufficiently challenging. But Summit Ridge Academy is an accredited school in the same district as Lee's Summit North. While attending Summit Ridge Academy, the Wilsons earned academic credit and stayed on track for graduation in May 2013. Moreover, although the Wilsons claim they were harmed because Summit Ridge Academy did not offer honors courses, the preliminary injunction was issued too late in the semester for them to receive credit at Lee's Summit North—the injunction could not prevent any potential harm resulting from the Wilsons' loss of honors credit. See <u>CDI Energy Servs. v. W. River Pumps, Inc.</u>, 567 F.3d 398, 403 (8th Cir. 2009) (irreparable harm factor weighed against preliminary injunction because the harm "to a large extent,

ha[d] already occurred."). Under these facts, we are not convinced the Wilsons were at risk of any real academic harm, much less any "certain and great" harm that could be prevented by an injunction. Iowa Utils. Bd., 109 F.3d at 425.

The other harm the District Court identified was the Wilsons' inability to try out for the Lee's Summit North band during their suspension. The Wilsons argued they might pursue careers in music; if they did not participate in band, they might jeopardize their music careers in college and beyond. But any future harm to the Wilsons' careers was speculative. Speculative harm does not support a preliminary injunction. See, e.g., Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare, 602 F.2d 150, 154 (8th Cir. 1979) ("[T]he speculative nature of the threatened harm support[s] the denial of injunctive relief."). Therefore, the harms the District Court identified do not constitute irreparable harm sufficient to sustain a preliminary injunction.

Since we conclude the District Court's findings of irreparable harm and the Wilsons' likelihood of success on the merits do not support a preliminary injunction, we need not address in detail the parties' arguments as to the remaining Dataphase factors. However, our decision not to analyze the interests of the School District, its students, and the public does not mean those interests are unimportant; they are important. The specter of cyber-bullying hangs over this case. The repercussions of cyber-bullying are serious and sometimes tragic. The parties focus their arguments on the disruption caused by the racist comments, but possibly even more significant is the distress the Wilsons' return to Lee's Summit North could have caused the female students whom the Wilsons targeted.

C. Additional Arguments

The parties make several additional arguments we wish to address. First, the Wilsons argue they can prevail on the merits based on the Communications Decency Act ("CDA"). Under the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Wilsons argue that they were merely providers of a computer service, namely, NorthPress, and that they cannot be treated as the "publisher or speaker" of the third student's post. Since the Wilsons claim the third student's racist post was the cause of any actual disruption, they argue they were unlawfully punished for the third student's speech.

We make no comment as to whether the CDA protects high school students from school discipline. However, the District Court's findings do not support the Wilsons' contention that the disruption stemmed exclusively from the third student's post. The District Court expressly found that the Wilsons' own posts contributed to the disruption. Thus, the CDA would not necessarily protect the Wilsons even if it applied.

Second, we disagree with the School District's argument that the District Court should have evaluated the Wilsons' Motion for a Preliminary Injunction under the standard for a permanent injunction. As the District Court stated, the preliminary injunction did not reduce or forgive the Wilsons' suspensions. Moreover, a movant must show "actual success on the merits" to obtain a permanent injunction. Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1012 (8th Cir. 2011) (citation omitted). At the pre-trial stage, it would have been impossible for the Wilsons to show actual success. Thus, it was appropriate for the District Court to apply the preliminary injunction test under Dataphase.

-14-

Finally, we reject the School District's argument that the District Court improperly shifted the burden from the Wilsons to the School District when the District Court suggested this case could be resolved on summary judgment during summer 2012. The District Court did not shift the evidentiary burden to the School District, and its comments were not improper. The District Court's comments simply indicated its belief that an early resolution was in the best interests of all parties.

## III.

We leave to the District Court the unenviable task of fashioning a remedy several months after the entry of the injunction and the Wilsons' return to school. However, based on the record and findings of the District Court, we conclude the entry of the injunction in March 2012 was in error. We vacate the District Court's Order and reverse the preliminary injunction.

———————————————